IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ERIC NISLEY,

               Plaintiff,

        v.

ELLEN F. ROSENBLUM, in her individual
capacity; FREDERICK BOSS, in his
individual capacity; and WASCO COUNTY,
a political subdivision of the State of Oregon,

               Defendants.

Case No. 3:21-cv-01011-SB

**OPINION AND ORDER**

_____

**BECKERMAN, U.S. Magistrate Judge.**

      Eric Nisley ("Nisley") brings this 42 U.S.C. § 1983 action against Oregon Attorney

General Ellen Rosenblum ("Rosenblum"), Oregon Deputy Attorney General Frederick Boss

("Boss") (together, the "State Defendants"), and Wasco County (the "County"). Nisley alleges

claims for violations of his procedural and substantive due process rights, violations of his right

to equal protection, intentional interference with economic relations ("IIER"), negligence,

negligence per se, and conversion.

      The State Defendants and the County move to dismiss Nisley's claims for failure to state

a claim upon which relief can be granted. See FED. R. CIV. P. 12(b)(6). The Court has

PAGE 1 – OPINION AND ORDER

jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and the parties have consented to the

jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons explained

below, the Court grants both motions to dismiss.

## BACKGROUND[1]

This case concerns Nisley's time serving as the County's district attorney. (Am. Compl.

¶¶ 6-7.) Nisley was reelected as the district attorney and began serving a four-year term in

January 2017. (*Id.* ¶ 8.) Nisley filed as a candidate for reelection in September 2019. (*Id.* ¶ 9.)

In December 2019, the Oregon Supreme Court concluded that Nisley "violated the

Oregon Rules of Professional Conduct and ordered that he be temporarily suspended from the

practice of law for a period of [sixty] days." (*Id.* ¶ 11.) In late January 2020, about two weeks

before the suspension began, Boss sent a letter to Oregon Governor Kate Brown (the

"Governor"), advising her that Nisley's suspension would render the County's office of district

attorney "vacant" within the meaning of Or. Rev. Stat. § 236.010(1)(g).[2] (Am. Compl. ¶¶ 11-

12.) Boss also advised the Governor to "take 'immediate action' to appoint a successor," and

suggested that Rosenblum's office was prepared to discharge Nisley's responsibilities. (*Id.* ¶ 12.)

In early February 2020, the Governor sent a letter to Rosenblum stating, "I am compelled

to direct you to discharge the responsibilities of the Wasco County District Attorney starting on

February 10, 2020, until I can appoint a successor or one is lawfully elected." (*Id.* ¶ 15.)

---

[1] Nisley alleges the following facts in his amended complaint, and the Court "accept[s] 'all factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party.'" *Curtis v. Irwin Indus.*, 913 F.3d 1146, 1151 (9th Cir. 2019) (quoting *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029-30 (9th Cir. 2009)).

[2] This statute provides, in relevant part, that "[a]n office shall become vacant before the expiration of the term if . . . [t]he incumbent ceases to possess any other qualification required for election or appointment to such office." Or. Rev. Stat. § 236.010(1)(g).

Thereafter, in response to Boss and Rosenblum's "request or direction" and in accordance with the County's Board of Commissioners' (the "Board") decision to "comply," the County removed Nisley's name from its website and the district attorney's office, and informed the public that an assistant attorney general would serve as the acting district attorney. (*Id.* ¶ 16.)

On February 10, 2020, the County "excluded" Nisley from the district attorney's office and Rosenblum and Boss sent Oregon Department of Justice ("DOJ") staff members to "assume control" of the district attorney's office. (*Id.* ¶¶ 16-17.) The DOJ staff members instructed the office's personnel to "refrain from speaking with [Nisley]." (*Id.* ¶ 17.) Around the same time, Boss and Rosenblum, or DOJ "officials acting in concert with them and at their direction," caused the State of Oregon (the "State") to stop paying Nisley's salary as of February 10, 2020, and to terminate Nisley's employer-provided health insurance. (*Id.* ¶ 18.)

Nisley asserts that he received no prior notice or opportunity to be heard regarding the State Defendants and County's above-referenced actions, and that despite receiving a detailed written analysis from Nisley's counsel, the State Defendants "refused to reconsider their legal advice to the Governor and the actions that they undertook or caused to be undertaken to terminate [Nisley's] employment and oust him from his public office."[3] (*Id.* ¶¶ 20-21.) Nisley also asserts that although other Oregon district attorneys have been suspended from the practice of law, they continued to "hold the office of district attorney," "be paid his or her regular salary

---

[3] As discussed below, Nisley's amended complaint references and relies on the Oregon Supreme Court's decision in *State ex rel. Rosenblum v. Nisley*, 473 P.3d 46 (Or. 2020), a *quo warranto* proceeding addressing whether Nisley was "the lawful holder of the office of Wasco County District Attorney." *Id.* at 48. The decision reflects that after receiving Nisley's counsel's letter, Rosenblum advised Nisley's counsel that her "office would discharge the duties of the Wasco County District Attorney beginning on the date of [Nisley's] suspension, as directed by the Governor." *Id.*

and benefits," and "enjoy all of the perquisites of the office during the period of their suspension and until they left the office through resignation, recall or the end of their term[.]" (*Id.* ¶ 14.)

In March 2020, not long after Nisley's removal from office became public and only a few weeks before the primary election, another candidate launched a campaign for the County's office of district attorney. (*Id.* ¶ 22.) Nisley lost his bid for reelection in May 2020. (*Id.*)

Four months later, on September 24, 2020, the Oregon Supreme Court issued a decision holding that despite Nisley's temporary suspension, "the office of Wasco County District Attorney did not become vacant, and [Nisley] remain[ed] the rightful holder of the office until the expiration of his term of office." (*Id.* ¶ 23, quoting *Nisley*, 473 P.3d at 55.) After the Oregon Supreme Court issued its decision, the Governor sent a letter to Rosenblum rescinding her February 4, 2020 directive, and the State restored Nisley's "position and paid both his salary and insurance benefits for the interim period." (*Id.* ¶ 24.) Nisley returned to the district attorney's office in October 2020 and completed his four-year term in January 2021. (*Id.* ¶ 25.)

In early 2021, Hood River County offered Nisley a temporary position as a deputy district attorney, but later revoked the offer (before Nisley accepted) after receiving negative information about Nisley's qualifications and character. (*Id.* ¶¶ 26-27.) In mid-2021, Jefferson County offered Nisley a position as a deputy district attorney, but later limited the offer to ninety days after receiving negative information about Nisley's qualifications and character. (*Id.* ¶¶ 26, 28.) Nisley accepted the temporary position in Jefferson County and currently works there, and will need to relocate his family if it turns into a permanent position. (*Id.* ¶ 29.)

Based on these events, Nisley filed this § 1983 action against the State Defendants and County on July 9, 2021. In his amended complaint, filed on October 21, 2021, Nisley alleges claims for violations of his procedural and substantive due process rights, violations of his right

to equal protection, intentional interference with economic relations, negligence, negligence per se, and conversion.

## LEGAL STANDARDS

To survive a motion to dismiss under FED. R. CIV. P. 12(b)(6), a plaintiff's "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (simplified).

## DISCUSSION

### I.    THE STATE DEFENDANTS' MOTION

The State Defendants argue that Nisley fails to state plausible claims for violation of his right to equal protection, violation of his substantive due process rights, and negligence. (State Defs.' Mot. Dismiss at 2.) As explained below, the Court agrees and grants the State Defendants' motion to dismiss.

#### A.    Equal Protection

##### 1.    Applicable Law

"[A]n equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that []he has been irrationally singled out as a so-called 'class of one.'" *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1122 (9th Cir. 2022) (quoting *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008)). Nisley

claims that he has been irrationally singled out as a "class of one." (*See* Am. Compl. ¶¶ 47-49,

alleging that the State Defendants treated Nisley differently than "[e]very other Oregon District

Attorney who had previously been suspended from the active practice of law"; Pl.'s Resp. State

Defs.' Mot. at 7, maintaining that Nisley has plausibly alleged a class-of-one claim).

      To state a class-of-one equal protection claim, Nisley "must allege facts showing that [he

has] been '(1) intentionally (2) treated differently from others similarly situated and that (3) there

is no rational basis for the difference in treatment.'" *SmileDirectClub*, 31 F.4th at 1122-23

(quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Until recently, the Ninth

Circuit had "not had occasion to determine what degree of similarity makes a plaintiff 'similarly

situated' to others in the class-of-one context, and the Supreme Court has offered little guidance

on that front." *Id.* at 1123. In *SmileDirectClub*, however, the Ninth Circuit "join[ed] [its] sister

circuits in holding that a class-of-one plaintiff must be similarly situated to the proposed

comparator in all material respects," noting by way of example that the Second Circuit has

"explained that class-of-one plaintiffs must show an extremely high degree of similarity between

themselves and the persons to whom they compare themselves," and the Seventh Circuit likewise

requires a plaintiff to be "directly comparable in all material respects to the comparator." *Id.*

(simplified).

### 2.    Analysis

      The State Defendants argue that Nisley fails adequately to allege a class-of-one equal

protection claim because his allegations do not establish that they treated similarly situated

individuals differently. (State Defs.' Mot. Dismiss at 10.) The State Defendants note that during

Boss and Rosenblum's tenures, the Oregon State Bar never suspended a district attorney, and

that Nisley is required specifically to identify those who he claims were similarly situated. (*Id.* at

11; State Defs.' Reply at 4.)

PAGE 6 – OPINION AND ORDER

The Court finds instructive the district court's decision in *O'Connor v. County of Clackamas*, No. 3:11-cv-1297-SI, 2012 WL 3756321, at *11 (D. Or. Aug. 28, 2012). In that case, the plaintiffs based their class-of-one equal protection claim on a theory that the defendants treated them "differently from other landowners, developers and contractors" with respect to applications for land use permits. *Id.* The district court found that the plaintiffs failed to state a claim and dismissed with leave to amend, noting that the plaintiffs had "not specifically identified any similarly-situated land owners, developers, or contractors who were treated differently," and instead "merely and broadly reiterate[d] that they ha[d] been treated inappropriately." *Id.*; *see also CLM ex rel. McNeil v. Sherwood Sch. Dist. 88J*, No. 3:15-cv-01098-SB, 2016 WL 8944450, at *10 (D. Or. Dec. 30, 2016) (noting that to prevail, "[a] class-of-one plaintiff 'must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves,'" and that "[s]trict enforcement of the similarly-situated requirement is a vital way of minimizing the risk that, unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors") (citation omitted).

This case is similar to *O'Connor*, in that Nisley fails specifically to identify the district attorneys who were similarly situated to him. Although he alleges that other district attorneys were suspended from the practice of law but continued to hold office, Nisley fails to address, among other things, whether these attorneys' suspensions were for a comparable length of time. Given this lack of specificity, Nisley fails plausibly to allege that he is similarly situated to his proposed comparators in all material respects, and thus fails to state an equal protection claim.

For these reasons, the Court grants the State Defendants' motion to dismiss Nisley's equal protection claim. *Cf. SmileDirectClub*, 31 F.4th at 1122-23 (explaining that although the plaintiffs claimed that they were subject to investigations and singled out on the basis of "economic protectionism and animus" despite being like "every other" dentist from the state who prescribed "clear aligner therapy" and was subject to the state dental board's authority, the plaintiffs also "tout[ed] their uniqueness" and "operate[d] a materially different business model, at a significantly different price point, using new and different technology," and therefore the plaintiff could not "establish that they [were] 'similarly situated' to all other licensed dentists and orthodontists in [the state]" or cure their complaint's deficiencies).

### B.    Substantive Due Process

#### 1.    Applicable Law

"To establish a substantive due process claim, a plaintiff must, as a threshold matter, show a government deprivation of life, liberty, or property." *Heidt v. City of McMinnville*, No. 15-989-SI, 2015 WL 9484484, at *7 (D. Or. Dec. 29, 2015) (quoting *Nunez v. City of L.A.*, 147 F.3d 867, 971 (9th Cir. 1998)). Notably, "'only the most egregious official conduct' establishes a substantive due process violation." *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

To state a substantive due process claim, a plaintiff must allege facts demonstrating that the defendant's actions "shock[ed] the conscience." *Sylvia Landfield Tr. v. City of L.A.*, 729 F.3d 1189, 1195-96 (9th Cir. 2013) (explaining that "[t]o constitute a violation of substantive due process, the alleged deprivation must 'shock the conscience and offend the community's sense of fair play and decency,'" and holding that the plaintiffs' complaint "fail[ed] as a matter of law" because the plaintiffs' allegations did not "plausibly suggest," among other things, that the defendants' actions "rose to the level of [conduct] 'that shock[ed] the conscience'") (citations

omitted). Merely alleging negligence or lack of due care is insufficient to state a substantive due process claim. *See Leontiev v. Corbett Sch. Dist.*, 333 F. Supp. 3d 1054, 1063 (D. Or. 2018) (citation omitted).

### 2.    Analysis

The State Defendants argue that Nisley fails to state a substantive due process claim because the challenged conduct does not "shock the conscience." (State Defs.' Mot. Dismiss at 9.) The State Defendants emphasize that Oregon law requires the Governor to fill a district attorney position when a "vacancy" occurs, *see* OR. REV. STAT. § 8.640,[4] they were "taking steps to protect the sanctity of criminal convictions" because they were concerned that convictions secured during "Nisley's suspension would be successfully challenged by those convicted, based upon the fact that the [County district attorney] was not able to practice law," and their incorrect interpretation of the law amounted to no more than mere negligence. (State Defs.' Mot. Dismiss at 9-10.)

Nisley responds that the "deliberate indifference standard" applies to his substantive due process claim because the State Defendants had "an opportunity to deliberate on the decision to oust [Nisley] from his elected office following his suspension." (Pl.'s Resp. State Defs.' Mot. at 5.) Nisley maintains that he has stated a plausible substantive due process claim because the deliberate indifference standard "permits a claim where . . . [the] defendants disregarded a known or obvious consequence of their actions," and he has alleged facts demonstrating that the

---

[4] This statute provides that "[w]hen a vacancy occurs in the office of district attorney, the Governor must appoint some suitable person to fill the vacancy until the next election and qualification of a successor at the next general election," and that the person the Governor "appoint[s] to fill [the] vacancy in the office must qualify in the same manner as a person elected thereto, and shall have like power and compensation, and perform the same duties." OR. REV. STAT. § 8.640.

State Defendants "were aware of the obvious consequences of removing [him] from his elected office and had time to consider that consequence, yet they proceeded anyway." (*Id.* at 5-6) (simplified).

For substantive due process claims, a court must, as a threshold matter, determine which of two standards applies. *See A.B. v. Cnty. of San Diego*, No. 20-56140, 2022 WL 1055558, at *2 (9th Cir. Apr. 8, 2022) ("For Fourteenth Amendment substantive due process claims, official conduct that 'shocks the conscience' is cognizable. As a threshold matter, courts must determine which of two standards applies.") (citation omitted). Nisley advocates for the first standard, also known as the "deliberate indifference" standard, which "requires a plaintiff to show that the official . . . 'disregarded a known or obvious consequence of his action,'" and "applies only if the circumstances are such that 'actual deliberation is practical.'" *Id.* (quoting *Nicholson v. City of L.A.*, 935 F.3d 685, 692 (9th Cir. 2019) and *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017)). "The second standard requires a plaintiff to demonstrate that the official acted 'with a purpose to harm unrelated to legitimate law enforcement objectives.'" *Id.* (quoting *Nicholson*, 935 F.3d at 693).

Here, the State Defendants were afforded reasonable time to deliberate before acting. (*See* Am. Compl. ¶¶ 11-12, 15, 17-18, alleging that the State Defendants' January 30, 2020 letter advised the Governor that the suspension would create a vacancy in the County's office of district attorney, the Governor's February 4, 2020 letter directed the State Defendants to discharge Nisley's duties until she appointed a successor or one was lawfully elected, and on February 10, 2020, the State Defendants assumed control of Nisley's office, the same day his temporary suspension began). Thus, the State Defendants' conduct is conscience-shocking if

taken with deliberate difference toward Nisley's constitutional rights.[5] *See Sylvia*, 729 F.3d at

1195 (addressing a court's dismissal under FED. R. CIV. P. 12(b)(6) and explaining that "[w]here,

as here, circumstances afford reasonable time for deliberation before acting, we consider conduct

to be conscience-shocking if it was taken with deliberate indifference toward a plaintiff's

constitutional rights"); *see also Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)

(explaining that the Ninth Circuit has "distinguished the 'purpose to harm' standard from the

'deliberate indifference' standard, recognizing that the overarching test under either is whether

the [official's] conduct 'shocks the conscience'") (citation omitted).

The Ninth Circuit applied the deliberate indifference standard at the pleading stage in

*Sylvia*. In that case, the plaintiffs were landlords who owned apartment buildings and filed a

lawsuit related to the City of Los Angeles's (the "City") Rent Escrow Account Program

("REAP"), which was codified in the municipal code. 729 F.3d at 1190-91. The City's housing

department would place property into REAP if a landlord failed to repair habitability violations,

and determine an appropriate reduction in rent based on the severity. *Id.* After the City placed

their apartment buildings into REAP, the plaintiffs sued and alleged that "REAP, as applied to

them, violated their substantive due process rights." *Id.* at 1191. The district court dismissed the

---

[5] The State Defendants do not suggest that Nisley fails sufficiently to allege that their actions implicated his constitutional rights. (*See* State Defs.' Mot. Dismiss at 9-10; State Defs.' Reply at 1-3; *see also* Am. Compl. ¶ 42, alleging that Nisley had "constitutionally protected interests in continuing to hold the public office to which the people of Wasco County elected him and in continuing to be a state employee during his fixed term of office"). The Court therefore assumes without deciding that Nisley sufficiently alleges a constitutionally-protected interest in his right to, among other things, continue to hold elected office. *See Bullseye Glass Co. v. Brown*, 366 F. Supp. 3d 1190, 1198 (D. Or. 2019) (addressing a plaintiff's substantive due process claim at the motion to dismiss stage and assuming without deciding that the plaintiff sufficiently alleged a constitutionally-protected interest).

plaintiffs' substantive due process claims under FED. R. CIV. P. 12(b)(6), and the Ninth Circuit affirmed. 729 F.3d at 1191.

After recognizing that the deliberate indifference standard applied because the circumstances afforded the City reasonable time for deliberation, the Ninth Circuit held that the plaintiffs' claims "fail[ed] as a matter of law" because it fell "short of this standard." *Id.* at 1195-96. In so holding, the Ninth Circuit explained that many of the plaintiffs' factual allegations concerned "various alleged procedural deficiencies," such as the City's failure to afford the plaintiffs "timely notice . . . and hearings," which did "not amount to an adequately-pled claim for violation of [the] plaintiffs' *substantive* due process rights." *Id.* at 1195. The Ninth Circuit also explained that "[n]one of the allegations plausibly suggest[ed] that REAP was arbitrarily and unreasonably applied to any of the plaintiffs, or that the placement of [the] plaintiffs' properties into REAP rose to the level of [conduct] that shocks the conscience." *Id.* at 1195-96 (simplified).

Similar to Nisley's claims here, the Ninth Circuit addressed the arbitrary singling out of a particular person in *Bateson v. Geisse*, 857 F.2d 1300 (9th Cir. 1988). In that case, a builder purchased property "intending to build on the property a condominium development, a use which complied with the applicable zoning classification, and a convenience store." *Id.* at 1302. The builder sued after the city council voted to withhold issuing his "building permit although all requirements had been satisfied." *Id.* "Trying this case without a jury, the district court decided that the city council's decision to withhold [the builder's] building permit violated [his] right to substantive due process." *Id.* On appeal, the Ninth Circuit "agree[d] with the district court's conclusion that the [city and individual council members] violated [the builder's] substantive due process rights." *Id.* at 1303. The Ninth Circuit emphasized that the builder met all of the

necessary permit requirements, the applicable city regulations stated that "the building official *must* issue a building permit" if the applicant satisfied the requirements and did not provide for city council review, and the city council voted to withhold the building permit without providing the builder with "any process, let alone 'due' process." *Id.* The Ninth Circuit explained that "[t]his sort of arbitrary administration of the local regulations, which singles out one individual to be treated discriminatorily, amounts to a violation of that individual's substantive due process rights." *Id.*; *see also Bullseye Glass*, 366 F. Supp. 3d at 1200-01 (distinguishing the *Bateson* decision because the "the facts alleged by [the plaintiff] indicate[d] that [the defendants'] actions were neither arbitrary nor discriminatory but instead were related to a perceived serious health risk").

Based on the authorities discussed above and below, the Court concludes that Nisley fails plausibly to allege a substantive due process claim against the State Defendants. At the outset, the Court notes that Nisley's substantive due process claim is premised in part on alleged procedural deficiencies, such as a lack of "prior notice" and "opportunity to be heard." (*See* Am. Compl. ¶ 40, addressing Nisley's substantive due process claim and incorporating "by reference paragraphs 1-30," which assert that the State Defendants failed to provide Nisley with "prior notice" or the "opportunity to be heard"). Such procedural allegations do not support "an adequately-pled claim for violation of [Nisley's] *substantive* due process rights." *Sylvia*, 729 F.3d at 1195.

The Court also notes that Nisley's substantive due process claim is premised in part on legal conclusions, such as his allegation that the State Defendants' "actions were arbitrary [and] unreasonable[.]" (Am. Compl. ¶ 43.) The Court does not accept as true any legal conclusions in ruling on a motion to dismiss for failure to state a claim. *See W. Mining Council v. Watt*, 643

F.2d 618, 628-29 (9th Cir. 1981) (addressing a substantive due process claim under the Fifth Amendment and explaining that alleging that certain matters are "arbitrary and unreasonable" is a "legal conclusion which [the court was] not obliged to accept as true for purposes of ruling on a 12(b)(6) motion"); *Bullseye Glass*, 366 F. Supp. 3d at 1198 ("[Plaintiff often] blurs the distinction between well-pleaded facts, which the Court must credit as true at this stage of the lawsuit, and legal conclusions couched as factual allegations, which the Court need not credit as true.").

Nisley's substantive due process claim stems entirely from the State Defendants' "interpretation" of, and "legal position" regarding, OR. REV. STAT. § 236.010(1)(g), as it related to the Oregon Supreme Court's decision to suspend Nisley from the practice of law for sixty days, and the State Defendants' resulting "legal advice" to the Governor.[6] (*See* Am. Compl. ¶¶ 11-14, 21.) The Court finds that Nisley's well-pleaded factual allegations fail plausibly to suggest that the State Defendants' actions were arbitrary and unreasonable or rose to the level of conduct that shocks the conscience.

As Nisley points out (*see id.* ¶ 13), the State Defendants' legal interpretation was that Nisley's sixty-day suspension from the practice of law caused him to "cease[] to possess" a qualification for holding office and thus created a vacancy within the meaning of the statute. *See* OR. REV. STAT. § 236.010(1)(g) ("An office shall become vacant before the expiration of the term if . . . [t]he incumbent ceases to possess any other qualification required for election or appointment to such office."). Ultimately, the Oregon Supreme Court disagreed, and held that Nisley's suspension did not cause his office to "become vacant, and [he] remain[ed] the rightful

---

[6] The Attorney General's duties include rendering opinions and giving legal advice to the Governor. *See* OR. REV. STAT. § 180.060.

holder of the office until the expiration of his term[.]"[7] (Am. Compl. ¶ 23, quoting *Nisley*, 473 P.3d at 55.)

Nisley refers to the State Defendants' legal interpretation as "unprecedented," "strained," "unfounded," "incorrect," and not based on a "court decision or other published authority," and faults the State Defendants for not reconsidering their "legal position" in light of Nisley's counsel's "detailed written analysis" as to why there was no vacancy. (Am. Compl. ¶¶ 13, 21.) The Oregon Supreme Court's decision, however, demonstrates that this was a far more nuanced legal issue that turned on case-specific facts, which is particularly relevant to whether Nisley's claims are plausible because Oregon law "permits the Attorney General, when directed by the Governor, to take full charge of investigations and prosecutions over which the circuit court has jurisdiction," 473 P.3d at 47 n.1, and "events sufficient to cause a vacancy in public office are events of sufficient significance that the office holder must be replaced." *Id.* at 53; (*see also* Am. Compl. ¶ 15, the Governor stated that she was "compelled to direct" the State Defendants to "discharge" Nisley's "responsibilities" until she "appoint[s] a successor or one is lawfully elected").

---

[7] Nisley's amended complaint relies on and incorporates by reference the Oregon Supreme Court's decision, which is a public record and proper subject of judicial notice. *See Takieh v. Banner Health*, No. 21-15326, 2022 WL 474170, at *1 (9th Cir. Feb. 16, 2022) (holding that the district court did not abuse its discretion in taking judicial notice of a state court decision, which related to the subject matter of the plaintiff's claims, because "[t]he decision [was] a public record whose accuracy cannot be reasonably questioned," and noting that the plaintiff "incorporated the [state court] decision into his [complaint]" and "the decision [was] relevant to [the court's] determination of whether [the plaintiff's] claims [were] plausible"); *Fennell v. Becerra*, No. 20-cv-01522, 2020 WL 9422373, at *2 n.1 (N.D. Cal. June 3, 2020) ("Although the California Court of Appeal's decision in [the plaintiff's] state case is designated as not for citation as legal authority, the undersigned takes judicial notice of the decision for factual purposes as a matter of public record and as incorporated by reference by [the plaintiff's] present complaint."), *report & recommendation adopted by* 2020 WL 4495481 (N.D. Cal. July 7, 2020), *aff'd*, 859 F. App'x 50 (9th Cir. 2021).

To be sure, after rejecting Nisley's argument that "an active membership in the Oregon State Bar is not a qualification required for serving as an Oregon district attorney," the Oregon Supreme Court turned to the determinative question of whether Nisley's suspension meant that he "cease[d] to possess" that "qualification under the circumstances of this case." 473 P.3d at 49-51. Employing traditional tools of statutory construction, the Oregon Supreme Court examined OR. REV. STAT. § 236.010(1)(g)'s text and context and dictionary definitions. 473 P.3d at 52-54. Although it was "unable to determine, from the context of [the statute] alone, whether the legislature intended that even a temporary change in an office-holder's qualifications would cause a vacancy in the office," the "context provided by other statutes" persuaded the Oregon Supreme Court that the legislature intended the phrase "ceases to possess" to "capture an event carrying a greater degree of permanence than [Nisley's] brief inability to practice law in this case." Id. at 53.

Notably, the Oregon Supreme Court emphasized that its "conclusions depend[ed] in significant part on the nature of [Nisley's] suspension," which did not carry a "conditional" right to reinstatement to active membership in the Oregon State Bar because it was "for less than six months" and the Oregon Supreme Court "did not direct otherwise in the suspension decision." Id. at 53-54; see also id. at 55 n.11 (explaining that a suspended attorney's "right to reinstatement without an application is not available if the person, although given a disciplinary suspension of less than six months, waits more than six months to seek reinstatement") (citation omitted). The Oregon Supreme Court also observed that "the potential sanction for an attorney who has violated the rules of professional conduct . . . include a suspension . . . as long as five years," and the "denial of reinstatement [is] a potential outcome" in some suspension cases. Id. at 54-55.

PAGE 16 – OPINION AND ORDER

Given this context, the Court concludes that the State Defendants' conduct was based and depended on a legal interpretation that later proved to be erroneous in light of case-specific factual circumstances, but it was not taken with deliberate indifference toward Nisley's constitutional rights. *See Bravo v. Beard*, No. 12-cv-06414, 2013 WL 5862749, at *3 (N.D. Cal. Oct. 30, 2013) (explaining that "[d]ecisions based upon erroneous legal interpretation or made with a lack of due care are not necessarily constitutionally arbitrary," and noting that the Ninth Circuit has held that "[s]ubstantive due process secures individuals from arbitrary government action that rises to the level of egregious conduct, not from reasonable, though possibly erroneous, legal interpretation" (quoting *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006))); *see also Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990) ("[T]he advice was a misstatement of law, [which] constitutes nothing more than a misjudgment of law, and clearly cannot be deemed arbitrary, capricious or so unreasonable to be egregious. We therefore find that [the plaintiff's] substantive due process claim fails to state a claim for relief.") (citation omitted). Accordingly, the Court grants the State Defendants' motion to dismiss Nisley's substantive due process claim. *See Hendricks v. Pierce Cnty.*, No. 13-5690, 2014 WL 1053318, at *7 (W.D. Wash. Mar. 19, 2014) (holding that the facts did not support a "claim of egregious conduct that shocks the conscience, as a matter of law," and granting a motion to dismiss the plaintiffs' due process claims).

### C.    Negligence

The State Defendants argue that the economic loss rule bars Nisley's negligence claim because he seeks to recover purely economic losses. (State Defs.' Mot. Dismiss at 11.) The Court agrees.

///

///

### 1.    Applicable Law

"The economic loss doctrine is a common-law doctrine created by courts in response to pragmatic concerns over unbounded liability." *JH Kelly, LLC v. Quality Plus Servs., Inc.*, 472 P.3d 280, 286 (Or. Ct. App. 2020) (citation omitted). The "economic loss rule" bars a plaintiff from recovering for "'purely economic loss' caused by a third person, absent the plaintiff establishing the presence of a fact or circumstance that conceptually remove[s] the case from the realm of the concerns for unbounded litigation that gave rise to the rule—that is, the plaintiff must establish a limiter." *Id.* at 287 (citing *Hale v. Groce*, 744 P.2d 1289, 1290 (Or. 1987)). The "first and most obvious limiter," which renders the economic loss rule inapplicable, is a request to recover for an "injury to persons or property," because such damages "provide[] an obvious boundary to concerns of *unbounded* liability." *Id.* If the plaintiff has not suffered and cannot seek recovery for an injury to persons or property, "the plaintiff must show some other limiter," such as "[s]ome source of a duty outside the common law of negligence." *Id.* (quoting *Hale*, 744 P.2d at 1290).

### 2.    Analysis

The State Defendants argue that the economic loss rule bars Nisley's negligence claim because he alleges only economic loss, not an injury to person or property. (State Defs.' Mot. Dismiss at 11.) Nisley disagrees and argues the "core harm" he suffered was "reputational harm," which is "intangible property," "not merely economic," "on a par with harm to one's person," and a type of injury that the Oregon Constitution's remedy clause addresses, along with injury to "person" or "property." (Pl.'s Resp. State Defs.' Mot. at 9-10.) With respect to case law, Nisley relies on a federal district court case stating that reputation is a "*quintessential* example[] of intangible property," *Liberty Corp. Cap. Ltd. v. Sec. Safe Outlet, Inc.*, 937 F. Supp. 2d 891, 904 (E.D. Ky. 2013), and a state court decision finding the economic loss doctrine

inapplicable because the damages at issue "were not solely for economic loss, as they include[d] damages to [the counterclaimant's] reputation and business—his intangible property[.]" *Lopez v. Javier Corral, D.C.*, No. 51541, 2010 WL 5541115, at *4 (Nev. Dec. 20, 2010) (unpublished table opinion).

The Court finds unpersuasive Nisley's arguments and supporting authorities. Courts in this district have rejected the theory that Nisley advances here. For example, in *Wenzel v. Klamath County Fire District No. 1*, No. 1:15-cv-01371-CL, 2017 WL 8948595, at *14 (D. Or. Aug. 29, 2017), *findings and recommendation adopted by* 2017 WL 5599478, at *1-2 (D. Or. Nov. 21, 2017), the plaintiff claimed that his reputation was damaged because the defendants conducted a negligent workplace conduct-related investigation before terminating his employment and issuing a report "filled with misrepresentations [that] created false impressions about [him]." 2017 WL 8948595, at *14. The court recommended that the district judge grant summary judgment to the defendants on the plaintiff's negligence claims, noting that "[a]ny harm to [the plaintiff's] reputation [was] distinguishable from injury to his person for the purposes of the economic loss rule, as reputational harm would result in 'financial losses such as indebtedness incurred and return of monies paid.'" *Id.* (citing *Onita Pac. Corp. v. Trs. of Bronson*, 843 P.2d 890, 896 n.6 (Or. 1992)). The district judge adopted the court's recommendation, and in doing so, added that the plaintiff was required, but failed, to establish that the defendants owed him a special duty because he "alleged only economic losses[.]" 2017 WL 5599478, at *2.

Similarly, in *Key Compounds LLC v. Phasex Corp.*, No. 6:20-cv-00680-AA, 2021 WL 3891586, at *7 (D. Or. Aug. 31, 2021), the individual plaintiff based his negligence and gross negligence claims, in part, on his reputation being damaged "as a result of his detention, arrest,

prosecution, and being cast in a false light." *Id.* The court determined that harm to the individual plaintiff's reputation "f[e]ll within the definition of 'purely economic losses,'" and therefore dismissed his claims to the extent they sought to recover for "damage to reputation." *Id.* (citations omitted).

Other courts have ruled in a similar manner and noted the absence of a limiter in cases involving alleged reputational damage. *See, e.g.*, *Andrews v. Plains All Am. Pipeline, LP*, No. 15-4113, 2020 WL 3105423, at *12 (C.D. Cal. May 21, 2020) (holding that the plaintiffs' "reputational damage argument raise[d] similar issues to those . . . under the economic loss rule: it does not provide a line with which to grant damages"); *Stender v. BAC Home Loans Servicing*, No. 12-cv-41, 2013 WL 832416, at *4 (N.D. Ind. Mar. 6, 2013) ("[T]his court must reject plaintiffs' argument that intangible alleged harms such as injuries to their credit score and reputations can be remedied with a claim for negligence. Because plaintiffs' claims are purely economic in nature, plaintiffs' negligence claim is barred by the economic loss doctrine, and must be dismissed."); *Rentzell v. Dollar Tree Stores, Inc.*, No. 10-cv-04270, 2011 WL 4528367, at *2 (E.D. Pa. Sept. 29, 2011) (rejecting the plaintiff's argument that "he suffered an injury to property in the form of injury to his reputation [because] courts have held that harm to reputation constitutes economic loss, not injury to person or property."); *see also Harris v. Suniga*, 149 P.3d 224, 228 (Or. Ct. App. 2006) ("We recognize that, strictly speaking, the fact that prior cases have defined 'economic losses' to include financial losses to intangibles does not necessarily mean that the term is limited to such losses.").

Consistent with the authorities cited herein, the Court concludes the economic loss rule bars Nisley's negligence claim. Although Nisley argues that the damage to his reputation and good name in the legal community and among the voting public is equivalent to intangible

property or harm to his person, it is evident that Nisley's alleged reputational damage resulted in financial losses and raises concerns related to unbounded litigation. (*See* Am. Compl. ¶ 63, seeking "$1 million [in negligence-related damages], including lost wages and benefits, harm to reputation, emotional distress, and incurrence of attorney fees and others costs necessary to reverse his wrongful ouster and to regain his position as district attorney"). Furthermore, Nisley fails to address or distinguish several cases, including the cases above from this district, that have rejected nearly identical arguments.

In sum, the Court concludes that the economic loss rule bars Nisley's negligence claims, and therefore grants the State Defendants' motion to dismiss Nisley's negligence claim.

## II.    THE COUNTY'S MOTION

Nisley asserts claims against the County for violations of his procedural and substantive due process rights, negligence, negligence per se, intentional interference with economic relations, and conversion, and the County moves to dismiss each claim on the ground that Nisley fails to state a plausible claim. (Wasco Cnty.'s Mot. Dismiss at 1, 19; Am. Compl. at 10-13, 15-18.) Nisley opposes the dismissal of his claims against the County, with the exception of his conversion claim. (Pl.'s Resp. Wasco Cnty.'s Mot. at 3.) The Court therefore grants the County's motion to dismiss Nisley's conversion claim, and addresses the remaining claims in turn.

### A.    *Monell* Claims

To state a § 1983 claim against a local government entity under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), a plaintiff must plead sufficient facts plausibly to allege that "(1) [the plaintiff] was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *J.K.J. v. City of San Diego*, 17 F.4th 1247, 1255 (9th Cir. 2021) (quoting *Lockett v. Cnty. of L.A.*,

977 F.3d 737, 741 (9th Cir. 2020)). "A plaintiff can satisfy *Monell*'s policy requirement in one of three ways." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (citing *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014)). One way is to show that "an official with final policy-making authority . . . ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 974 (quoting *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070 (9th Cir. 2016)).

Nisley brings ratification-based *Monell* claims against the County here. (*See* Am. Compl. ¶¶ 4, 16; Pl.'s Resp. Wasco Cnty.'s Mot. at 4-5.) Specifically, Nisley's theory is that the Board, as the County's final policymaker who made the "decision to comply" with the State Defendants' "requests" and "directions," ratified the County officials' unconstitutional actions, such as removing Nisley's name from the district attorney's office and the County's website, excluding Nisley from the district attorney's office, and identifying "an Assistant Attorney General as the 'Acting District Attorney' in their communications with the public." (Am. Compl. ¶ 16.) Nisley alleges that the County's officials' actions were "taken in response to [the State Defendants'] request or direction." (*Id*).

The County argues that Nisley fails to state plausible *Monell* claims because "[w]hen a particular act or decision resides with the State and not a county, a county does not ratify the State's acts by simple facilitation." (Wasco Cnty.'s Mot. Dismiss at 3.) In support of this argument, the County relies on the district court's decision in *Foster v. Flaherty*, No. 11-6115-HO, 2011 WL 5057072, at *1 (D. Or. Oct. 24, 2011), *aff'd*, 621 F. App'x 463 (9th Cir. 2015). (Wasco Cnty.'s Mot. Dismiss at 3.) The County also disputes whether Nisley has plausibly

alleged that the County was the moving force or proximate cause of Nisley's alleged injury. (Wasco Cnty.'s Reply at 3.)

The plaintiffs in *Foster* were former deputy district attorneys who voted in favor of unionization after the district attorney lost a "bitter and intense campaign[]" and the incoming district attorney informed the county that he intended to fire several deputies. 2011 WL 5057072, at *1-2. Before taking office, the incoming district attorney encouraged the county to withhold taking any action on a proposed collective bargaining agreement ("CBA"), and informed the plaintiffs that if they wanted to be considered for an appointment, they needed to send a letter of interest and resume to him and appear for interviews at his law office. *Id.* Although the county's legal counsel expressed concern that the incoming district attorney was targeting the "deputies for discharge in retaliation for exercising their rights to participate in union activities," the county (and the then-district attorney) encouraged and paid the plaintiffs to schedule and appear for interviews during their normal work hours. *Id.* at *2-6. After their interviews, the plaintiffs learned that the incoming district attorney decided to terminate the plaintiffs and that the county's commissioners elected to delay the vote on the CBA. *Id.* at *2-3.

The county and its commissioners moved to dismiss the plaintiffs' § 1983 claim for violation of their rights to free speech and free association, arguing that the county did not employ the plaintiffs or have any authority over the incoming district attorney's actions. *Id.* at *3-4. The district court explained that although Oregon law reflects that the county provides the district attorney and deputies with office space, facilities, supplies, and assistance and may empower the district attorney to appoint deputies "whose compensation shall be fixed by the county . . . and paid out of the county funds in the same manner as county officers are paid," district attorneys are state law officers charged with appointing their own deputies, who "serve at

the pleasure of the district attorney." *Id.* at *4-5 (simplified). Consistent with this understanding, the district court rejected the plaintiffs' theory of municipal liability and dismissed their § 1983 claim:

> [The plaintiffs] also assert their rights were violated in that they were required to interview with [the incoming district attorney] prior to [his] installment . . . and that, the county facilitated this violation. However, no economic harm is alleged to have resulted from the interviews themselves. To the extent the allegations could be read to establish non-economic harm, [the then-district attorney], who had authority to direct the plaintiffs, encouraged [the] plaintiffs to comply with [the incoming district attorney's] request. No reasonable set of facts could establish that failing to dock pay or require use of leave time resulted in the violation of [the] plaintiff[s'] constitutional rights. Moreover, the actor alleged to have committed the constitutional torts . . . is, at best, a policymaker for the state (as a state officer), not the county. In addition, the county is not in a position to ratify or reject the policy of a district attorney regarding the appointment of his deputies. Municipal liability cannot be attributed to the county for the actions of a non-[c]ounty policymaker. Accordingly, [the] plaintiff[s'] section 1983 claim against the county and county commissioners is dismissed.

*Id.* at *6.

Nisley argues that the *Foster* decision is distinguishable and "does not assist the County" because the County "took actions in the process of ousting [Nisley] from his elected office that, while in concert with the State, required [the] County to make its own decision," and thus the County's decision to "comply with the State's request and oust [Nisley] from his elected office" was "not mere facilitation." (Pl.'s Resp. Wasco Cnty.'s Mot. at 5-6.) Nisley also notes that the County had "a statutory obligation to provide [him] with the facilities he needed to execute the duties of his office," and the County's "decision to withhold those facilities and to oust [him] from his office was not mere facilitation of the State's decision."[8] (Pl.'s Resp. Wasco Cnty.'s Mot. at 6.)

---

[8] Nisley's argument about a statutory obligation is based on OR. REV. STAT. § 8.850, which provides that "[e]ach county shall provide the district attorney and any deputies for such county with such office space, facilities, supplies and stenographic assistance as is necessary to

Even assuming Nisley has a property interest in the "perquisites" of the district attorney's office or that he has adequately alleged that the County's statements were sufficiently stigmatizing to implicate a liberty interest (*see* Pl.'s Resp. Wasco Cnty.'s Mot. at 6-12),[9] the Court concludes that Nisley fails to allege any plausible ratification-based *Monell* claims against the County.

The Ninth Circuit's recent decision in *J.K.J.* is instructive here. In *J.K.J.*, the district court held that the plaintiff's complaint "failed to state a claim under *Monell* because . . . it failed to identify any municipal policy or custom as the cause of the alleged violation." 17 F.4th at 1254-55. On appeal, the plaintiff argued that he "adequately asserted a causal link by tracing [his mother's post-traffic stop and potential overdose-related] death back to the [c]ity's alleged failure to train and supervise its police officers," whose "alleged deviation from training indicated the need for more or different training." *Id.* at 1252-56 (simplified). The Ninth Circuit rejected these arguments and limited its discussion to the "moving force" element of a *Monell* claim, because it "suffice[d] to show that dismissal was warranted." *Id.* at 1255. The Ninth Circuit noted that the plaintiff alleged that officers were "'trained in accordance with Police Department policies to take immediate action to summon medical care' in circumstances like those [the officers] encountered when they met [the plaintiff's mother] . . . and [one of the officers] acted 'in direct contravention to the policy and training of the [Police] Department.'" *Id.* at 1256. The Ninth Circuit explained that "[t]hese allegations suggest[ed] that the moving force

---

perform efficiently the duties of such office." *Id. Foster* also addressed this statute. *See* 2011 WL 5057072, at *4.

    [9] *See Pounds v. Smith*, No. 20-35154, 2021 WL 3667229, at *3 (9th Cir. Aug. 18, 2021) (describing statements that "are sufficiently stigmatizing to implicate a [plaintiff's] liberty interest") (citation omitted).

behind the alleged constitutional violation was not a failure to train, but the officers' failure to heed their training." *Id.* The Ninth Circuit added that the plaintiff's complaint did not "allege facts indicating that this supposed failure to enhance officer training was the moving force behind [the plaintiff's mother's] injuries." *Id.* Thus, the Ninth Circuit held that the plaintiff "failed to state a claim for municipal liability." *Id.*; *see also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Because we find no ratification, we need not discuss whether the [city's] alleged ratification [of its police officers' conduct] was the cause in fact and proximate cause of the constitutional deprivation."), *modified on other grounds by Navarro v. Block*, 250 F.3d 729, 733 (9th Cir. 2001).

Similarly here, Nisley's allegations suggest that the "moving force" behind any alleged constitutional violation was not the County or County officials, but the State Defendants' requests and directions to the County and County officials, which were based on what later proved to be the State Defendants' incorrect legal interpretation. Indeed, Nisley's ratification-based *Monell* claims are based on the County's "decision to comply" with and "follow" the State Defendants' "requests" and "directions," and the actions the County's officials took "in response to [the State Defendants'] request or direction." (Am. Compl. ¶ 16.) These allegations fail to suggest that the County or County officials were the moving force behind any constitutional deprivation. Consistent with *J.K.J.*, the Court grants the County's motion to dismiss Nisley's *Monell* claims.

### B.     Negligence and Negligence Per Se

The County argues that the economic loss rule bars Nisley's claims for negligence and negligence per se because he alleges only economic losses and does not allege that there was a "special relationship between [him] and [the County]." (Wasco Cnty.'s Mot. Dismiss at 16-17.) Nisley opposes the County's motion to dismiss his claims for negligence and negligence per se

PAGE 26 – OPINION AND ORDER

based on the same arguments he made and authorities he cited in response to the State

Defendants' motion. (*Compare* Pl.'s Resp. Wasco Cnty.'s Mot. at 16-17, *with* Pl.'s Resp. State

Defs.' Mot. at 9-10.)

　　　For the same reasons discussed above, the Court finds that the economic loss rule bars

both Nisley's negligence and negligence per se claims. *See Bird v. Globus Med., Inc.*, No. 19-

1024, 2020 WL 5366300, at *3 (E.D. Cal. Sept. 8, 2020) (holding that "purely economic

damages [were] insufficient to plead injury for [the] plaintiff's negligence claims," and therefore

dismissing claims for negligence per se and failure to warn); *Andrews*, 2020 WL 3105423, at *10

(explaining that negligence per se affects the standard of care in a negligence action, but

"negligence per se is not an exception to the economic loss rule"); *Hamell v. Idaho Cnty.*, No.

16-469, 2017 WL 2870080, at *3 (D. Idaho July 5, 2017) (holding that the economic loss rule

barred the plaintiffs' negligence per se claim because no exception applied). The Court therefore

grants the County's motion to dismiss Nisley's negligence and negligence per se claims.

### C.　　Intentional Interference with Economic Relations

　　　The County's remaining arguments concern Nisley's IIER claim.[10] (Wasco Cnty.'s Mot.

Dismiss at 14-16.) To state an IIER claim, Nisley "must allege (1) the existence of a professional

or business relationship . . . , (2) intentional interference with that relationship, (3) by a third

party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect

between the interference and damage to the economic relationship, and (6) damages." *Nw.*

*Infrastructure LLC v. City of Portland*, No. 21-cv-0843-MO, 2021 WL 5912153, at *8 (D. Or.

---

[10] The County has "withdraw[n]" but not "waiv[ed]" its exclusive remedy argument."
(Wasco Cnty.'s Reply at 10.)

Dec. 14, 2021) (simplified). The County argues that Nisley fails adequately to allege the fourth

element. (Wasco Cnty.'s Mot. Dismiss at 14-16.)

"For a purpose to be improper, the defendant's 'purpose must be to inflict injury on the

plaintiff as such.'" *Anderson v. Freedom Mortg. Corp.*, No. 19-388-JR, 2019 WL 6135035, at *1

(D. Or. Nov. 19, 2019) (quoting *Nw. Nat. Gas Co. v. Chase Gardens, Inc.*, 982 P.2d 1117, 1124

(Or. 1999)). Alternatively, "[f]or a means to be improper, the 'means must be independently

wrongful by reason of statutory or common law[.]'" *Id.* (quoting *Douglas Med. Ctr., LLC v.

Mercy Med. Ctr.*, 125 P.3d 1281, 1289 (Or. Ct. App. 2006)). "Examples . . . include violence,

threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation,

defamation, or disparaging falsehood." *Sanford v. Hampton Res.*, 447 P.3d 1192, 1197 (Or. Ct.

App. 2019) (simplified).

Here, Nisley alleges that the County's actions "were taken for the improper purpose of

making misrepresentations to the public regarding [Nisley's] standing in office and good name,"

and "were taken with improper means because [the County] had no lawful authority to have

[Nisley] removed from office or prevent him from performing his official duties[.]" (Am. Compl.

¶ 54.) Citing these allegations, Nisley opposes the County's motion to dismiss his IIER claim.

(Pl.'s Resp. Wasco Cnty.'s Mot. at 18-20.) Nisley asserts that the County's arguments are

"unfounded," and that he need not allege that the County's *sole* purpose was improper because

the parties are not business competitors, that he has adequately alleged that the County's actions

were independently wrongful given the County's lack of authority to remove Nisley from office

or prevent Nisley from performing his official duties, and that the County's suggestion that its

actions were "privileged or justified" is an affirmative defense and a disputed issue of material

fact. (*Id.*)

There is some support for Nisley's argument that he need not plead that the County's sole purpose was improper. *See Johnston v. Kimberly-Clark Glob. Sales LLC*, No. 10-cv-540-PK, 2010 WL 3338708, at *6-7 (D. Or. July 29, 2010) (stating that "Oregon courts recognize that an [IIER] plaintiff need neither allege nor prove that the defendant lacked any legitimate purpose for its interference in order to prevail on an intentional interference claim," and citing Oregon Uniform Civil Jury Instructions); *see also Nw. Infrastructure*, 2021 WL 5912153, at *8 (explaining that "corporate agents do not act within the scope of employment if their *sole* purpose is one that is not for the benefit of the corporation," and dismissing a contractor's IIER claim against a government agency's employees because the contractor did not plausibly allege they "acted with an improper motive, let alone that such animus was their sole motivation") (simplified).

However, in cases outside of the business or employment context, such as *Grimstad v. Knudsen*, 386 P.3d 649, 651 (Or. Ct. App. 2016), Oregon courts have recognized that "[w]here the plaintiff's allegations are based on improper purpose, then the purpose 'must be to inflict injury on the plaintiff as such.'" *Id.* at 657 (quoting *Chase Gardens*, 982 P.2d at 1124). In fact, *Grimstad* noted that actions that are "wholly consistent with a proper purpose . . . 'd[o] not suffice to support an inference of [an] alleged improper purpose to injure' the plaintiff." *Id.* (simplified).

Nisley does not allege facts from which an inference could plausibly be drawn that in complying with the State Defendants' requests and directions, the County or County officials acted with an improper purpose to injure Nisley. Nisley relies largely on a bare and conclusory allegation about the County's "improper purpose of making misrepresentations to the public." (Am. Compl. ¶ 54.) That allegation does not plausibly suggest that the County's purpose was to

inflict injury on Nisley, where the County was merely complying with the State Defendants'
directives. Accordingly, the Court grants the County's motion to dismiss Nisley's IIER claim
based on an improper purpose.

Improper means, on the other hand, "are those that 'violate some objective, identifiable
standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps,
an established standard of a trade or profession.'" *Element Materials Tech. Food US LLC v.
Kahl*, No. 3:19-cv-1491-SI, 2020 WL 798156, at \*5 (D. Or. Feb. 18, 2020) (citation omitted). In
*Austin v. University of Oregon*, 205 F. Supp. 3d 1214, 1231 (D. Or. 2016), for example, the
student athlete plaintiffs' IIER claim was based on their university's "summary suspension" of
the plaintiffs "following the investigations [of rape allegations] and hearings into the accusations
of misconduct[.]" *Id.* at 1231. The plaintiffs alleged that the university's means were improper
because of "the constitutionally insufficient process and discrimination [the plaintiffs allegedly
suffered as a result of] the [u]niversity's actions," which interfered with the plaintiffs' potential
employment prospects in the National Basketball Association. *Id.* The district court dismissed
the IIER claim because the plaintiffs did not allege "both the intentionality of interference and
the improper means." *Id.* The district court emphasized that the plaintiffs did "not plausibly
allege that [the university] intended to interfere with their potential [employment] prospects by
investigating [the] allegations against them and suspending [them] based on [student conduct]
violations," and that "there is no place in the law of intentional interference for [a defendant's]
indirect, unintentional consequences." *Id.*

Similarly here, Nisley's factual allegations fail plausibly to support his claim that the
County intended to interfere with Nisley's "economic relationship with the State of Oregon" by
"remov[ing] him from office" or "prevent[ing] him from performing his official duties" without

the "lawful authority" to do so. (Am. Compl. ¶¶ 51-54.) Rather, Nisley's allegations reflect that the County simply complied with the State Defendants' directives based on the State Defendants' interpretation of the law. Although the Oregon Supreme Court later disagreed with the State Defendants' interpretation of the law under the circumstances presented, Nisley's allegations reflect that the legal issue was unsettled and subject to reasonable dispute. Nisley's allegations fail to suggest that any County officials believed otherwise, that they lacked the authority to proceed as they did, that they had the authority to refuse to comply with the State Defendants' directives, or that they intentionally made any misrepresentations about the situation. *See Anderson*, 2019 WL 6135035, at *1 (distinguishing "mere negligence" from "intentional deceit or misrepresentation"). Accordingly, the Court grants the County's motion to dismiss Nisley's IIER claim.

## III.    LEAVE TO AMEND

"If a complaint does not state a plausible claim for relief, a 'district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Perez v. Mortg. Elec. Registration Sys., Inc.*, 959 F.3d 334, 340 (9th Cir. 2020) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)). Here, the Court is unable to say that Nisley's claims could not possibly be cured by amendment. Accordingly, the Court grants Nisley leave to amend his complaint if he has a good faith basis to plead new allegations to cure the deficiencies identified herein.

///

///

///

///

**CONCLUSION**

For the reasons stated, the Court GRANTS the State Defendants' motion to dismiss (ECF No. 14) and GRANTS the County's motion to dismiss (ECF No. 13). Nisley may file an amended complaint within fourteen days if he is able to cure the deficiencies discussed herein.

**IT IS SO ORDERED.**

DATED this 23rd day of May, 2022.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge